Hitchcock, J.
It will he seen by the statement of the case. *402 that the complainant claims an interest in the land in contro versy, under a deed from a purchaser for taxes. The land so sold was sold under the law of January 29th, 1827, and at the time of sale the title was in the United States. It is sit mated in the Yirginia Military District, and was entered with the surveyor of the district, on the 22d of June, 1810, in the name of David Ross assignee, on three military warrants and part of a fourth — No. of entry 6780, — quantity of land 640 acres. On the 26th April, 1815, the land included in the entry was surveyed, and the survey recorded on the 29th September, 1817. Under the laws of the state, the land was entered for taxation in the name of David Ross, and the taxes being entirely unpaid, it was eventually sold in 1829. The complainant’s title depends upon the validity of this sale.
Subsequent to this tax sale, Neiswanger, the defendant, became interested in the aforesaid entry and survey by assignment, and procured to himself arpatent for the land as assignee, and thereby became invested with the legal title. Receiving the patent under these circumstances, it is claimed by complainant, that he holds the title in trust for him, and the court are called' upon to decree accordingly.
It is contended for the defendant, that this is not such a case as requires, or will even authorize, the interference of a court of equity. That the title which a purchaser at a tax sale requires, is a strictly legal title. That if defective, the defect cannot be cured by any action of this court, as a court of chancery. And further, that under the act of 1827, the law under which this land was sold, the deed of the county auditor is declared' to vest in the purchaser a good title. The words of the statute are, “ which deed shall convey to the purchaser or purchasers, assignee or assignees, a good and valid title to the land sold, and such deed shall be received in all courts of this state, as good evidence of title to the purchaser or purchasers, his or their heirs, assignee or assignees.”
The case is not without difficulty, in the view which is taken of it by defendant’s counsel, and.it may seem somewhat extra *403 ordinary that application should be made to a court of chancery, to remedy any defects in a title derived from a sale for taxes. Still, if a purchaser at tax sale acquires any interest by the purchase, it is not readily seen why he may not, in a court of chancery, be protected in that interest. In the case of Wallace v. Seymour & Remick, this court say, in speaking upon this subject: “ Although the effect of the auditor’s deed is only to convey an equity, where the former proprietor had no greater estate, yet, this is only between the legal estate and the purchaser. The tax deed purports to convey a legal estate. It is made by authority of the state, and as to all the world except him who has the legal interest, would convey a legal title. Further: should the former proprietor afterwards obtain his patent, although vested with the legal title, he must hold it in trust for the purchaser at tax sale. There is a difference in sales for taxes and upon execution. Upon the latter, equities cannot le sold, while express provision is made in the statute for selling any interest which a man may have in lands, for taxes.” 7 Ohio Rep., part 1, page 156. Here the court recognize the principle that a tax purchaser may, in a certain state of case, have relief in chancery.
It is proper to say, however, that the laws in force, under which the land referred to in that case was sold, contained a provision that the auditor’s deed should “ convey to the purchaser all the right, title and interest of the former proprietor, in and to the land so sold.” I do not know, however, that this can make any difference. It has ever been considered by this court, that such deed, if it conveyed any thing, did convey all the interest of the former proprietor, and the question has been agitated whether it did not, in fact, convey the legal title, although that legal title, at the time of sale, was in the government of the United States. In the case of Douglass v. Dangerfield, (10 Ohio Rep. 152,) cited by defendant’s counsel, the court seem to have been inclined to this latter opinion. But in the case of Neiswanger v. Gwynne, the court held that the purchaser at tax sale received no better title than was vested *404 in the former proprietor, at the time of sale ; that such purchaser could acquire no legal title, so long as the title was in the government at the time of the sale; and that the only redress which such purchaser would have against a subsequent patentee was in chancery. 18 Ohio Rep. 74.
In the case last referred to, the very title now before the court was in controversy. The defendant was prosecuting an ejectment against the present complainant, claiming under his patent. The complainant attempted to defend under his tax title. This defense was resisted, on the ground, not that there was any thing irregular in the sale for taxes, but on the ground that the fee of the land was in the government, at the time of the tax sale, and that therefore, the present complainant — defendant in that suit — had no legal title. The court so held, and the complainant was informed, in substance, that he had no redress, except in chancery ; and in the ejectment suit, the plaintiff had judgment.
In this case, the court held expressly, that under the tax sale, and the deed pursuant thereto, the complainant acquired no legal title, thereby denying the soundness of the position now assumed by defendant’s counsel. Not only so, the court strong ly intimated, if it did not directly so decide, that the complainant was entitled to relief in chancery, provided there was no defect in the tax sale.
The complainant, in consequence of the intimation of the court, next filed the present bill. This bill was met by a de•murrer. After hearing in the court of common pleas, the case was appealed to the supreme court, and reserved for decision in bank.
The case came on for hearing at the December term, 1846, and was fully argued by counsel. On the hearing of the demurrer, it was insisted by defendant’s counsel, as it is insisted now, that complainant’s title was purely legal. The court, however, overruled the demurrer, and ordered the defendant to answer. The reasons for this action of the court are fully given in the reported case, (15 Ohio Rep. 367.)
*405 Now the ease comes on for hearing upon the bill, answer, replication, exhibits and testimony, and still the same question is presented, which has been twice decided upon this very title: whether the remedy of the complainant is at law or in chancery ? It seems to the court that we are precluded from considering this question, under the circumstances. It has been deliberately settled, and we feel ourselves -bound by the decisions already made.
It now remains to inquire, whether the complainant shows in himself a good equitable title to the premises in controversy. He first produces a deed from the auditor of Madison county, to Lyne Starling, reciting, among other things, that the land in controversy had been sold on the 14th day of December, 1829, to the said Starling, for the taxes due thereon, pursuant to the acts of January 29, 1827, and February 11, 1829 — reciting, further, the titles of these acts; by which deed the land is conveyed to said Starling; also a deed subsequently made by Starling to himself. Sundry other documents are introduced, purporting to be copies from the record of the court of common pleas of Madison county, copies from the books of the auditor of said county, and also, copies from the books of the auditor of state. The design of introducing this evidence is, to show that the sale of the land was legally made. It is unnecessary, however, to ■ notice these items of evidence specifically, except so far as objections are made to them by defendant’s counsel.
Before considering these objections, however, it may be well to examine the laws under which the land was sold. Those laws are the act of January 29, 1827, “ for the remission of penalties and for the sale of land for taxes,” and an act supple mentary thereto, passed February 12,1829, (Chase’s Statutes, 1560 and 1628.)
These acts have reference to no other lands than those upon which taxes were due and unpaid prior to 1820. And any one who has any curiosity upon the subject, will, by looking into the legislation of the state, both before 1820, and from that pe *406 riod up to the time of the sale of the land now in controversy, find the great difficulty which the legislature experienced, in enforcing the payment of these taxes which were due upon land prior to 1820. Although the policy of the state from the organization of its government, had been to sell land for the taxes, if those taxes were not paid as they became due, this policy was for a time suspended and these sales were postponed from time to time, and for many years no sales were made. These postponements were occasioned undoubtedly on account of the fact that the courts of the day were very astute in detecting errors, and if any, the least error could be discovered in the course of the proceedings, tax sales were declared void. To such an extent did this practice prevail, that at length it was pretty generally believed 'that no valid title could be acquired under a tax sale. This difficulty led to the legislation ■upon this subject which is found in our statute books after 1820, and which by many has been thought to be somewhat stringent. But I have never known it to operate injuriously upon any one who was prompt in the payment of his taxes.
The act of 1827, as before remarked, relates solely to land upon which the taxes previous to 1820 were in arrear, as appears from the first section.
The 2d section authorizes payment of all arrearages of taxes upon these lands, to be paid into the state treasury until the first day of August, 1828, and into the respective county treasuries until the first day of December of the same year, and where the taxes are paid by those respective days, all penalties which had accrued for non-payment previous to 1820, were to be remitted.
In the next section, each county auditor is directed, before the first day of August, 1828, by the examination and comparison of duplicates, and documents in his office, and from such comparison and from such information as he may be able to procure, to make corrections in such delinquent land, and prepare a list of such lands, on which the taxes appear to be due* and immediately transmit the same to the auditor of state.
*407 By the next section, the auditor of state is directed immediately after the receipt of this list, to compare the same with the duplicates and documents in the office, “ and transmit to the several county auditors, a correct list of all the lands in .their respective counties, on which arrearages of taxes .are due and unpaid previous to the year one thousand eight hundred and twenty,” whether the said-lands have been forfeited or not, “ charging each tract or part of a tract with all such arrearages of taxes and interest, which may actually remain due and unpaid at that time.”
The act then goes on to provide that if the taxes are not paid by a specified time, the lands shall be sold. The steps preliminary to a sale are prescribed, and after sale the county auditor is directed to make a deed to the purchaser, “ which deed shall convey to the purchaser or purchasers, his or their heirs, or assignee or assignees, a good and valid title to the land so sold; and such deed shall be received in all courts in this state, as good evidence of title to the purchaser or purchasers, his or their heirs, or assignee or assignees; nor shall the title conveyed by said deed to the purchaser or purchasers, his or their heirs, assignee or assignees, be invalidated or affected by any error previously made in listing, taxing, selling or conveying said land. Such is the law under which this land was sold, and this court is bound to administer it.”
The act of February, 1829, merely extends the time within which such of these lands, as had not already been sold, might be sold, and this extension of time is one year. And on the land not so sold, another year is given to pay the taxes.
It is first objected that there is nothing to show that the county auditor, on or before the first day of August, 1828, sent to the auditor of state a list, as required by the second section of the act. A transcript from the books of the county auditor is given, which purports to be this list. The time in which it was sent does not appear, but I suppose under this law we may venture to presume that it was sent in time-, and that the officer performed his duty. But it is said that this list is not in ae *408 •cordance with the law, because it does not show the taxes in arrear prior to 1820, and the years for which such taxes were ■due. It does show that the taxes were in arrear prior to 1820, and the aggregate amount of taxes due-at the time the list is made out, including as well those before as those after 1820. It may not be technically correct, according to the statute, but if irregular, it is one of those irregularities for which we are not permitted by law to invalidate the deed.
The object of this list was unquestionably intended as a doc ument to assist the auditor of state in making out the list which was finally to be placed in the hands of the county auditor for collection. The auditor of state was not to be governed by it, ■however, but might rely upon other sources of information within his power, or reach. The thing to be ascertained was, ■the precise amount of taxes due upon the land, which should ■be offered for sale. And I do not apprehend that the sale would be avoided even had no list been transmitted to the ■auditor of state by the county auditor.
It is next objected that the list from the auditor of state, was •not transmitted to the county auditor in time. It seems to have been received by the county auditor on the 7th of October, 1829. It is claimed that it should have been transmitted •one year earlier. It was necessary that it should be in the hands of the county auditor in time for him to advertise. He •did not sell in 1828, possibly because he had not received this list; probably he did not advertise in that year. There is •nothing to show that he did. In consequence of this failure to sell, the law of 1829 was passed, and after the passage of this •law, the list might well be transmitted. The construction put upon this law of 1829, by counsel for defendant, would not ■carry out the intention of the legislature.
Again, it is objected that the hour of the day at which the sale is to commence, is not named in the advertisement. And again, that the return of the auditor does not show that the sale was at public auction.
The first was not necessary, and the last will be presumed.
*409 The last objection is, that the proceedings under the act of 1827, beginning with the list from the auditor of state, do not show that the land was in arrear for the taxes previous to 1820, or that the amount charged was actually due as charged upon the state auditor’s duplicate, while the defendant has introduced copies from the book of the auditor of state, showing that the amount actually due was much less than the amount charged upon the list or duplicate, under which the land was .sold.
It would seem that counsel has not noticed a part of the evidence in the case. On the 30th of January, 1822, an act was passed relative to these lands which were in arrear for the taxes prior to 1820. (Chase Stat. 1216.) This act provided for a proceeding in court for the collection of these back taxes, through the instrumentality of a judgment, and order of sale. The papers in the case show that such a judgment was actually recovered against this identical land, in the court of common pleas of Madison county, at the November term, 1843, for $276.55, that being the amount of taxes, interest, etc., then due. Upon this judgment an order of sale was issued, the land was offered for sale, and not sold for want of bidders, etc. Return was made to the auditor of state. Under the law of 1822, the land having been thus offered for sale, and not sold for want of bidders, was forfeited to, and became the property of the state. At the time the law of 1827 was passed, it was the property of the state, although it was to be entered upon the auditor’s list, therein provided for. It stood as forfeited land at the time the list was made out. And it .would seem to me that this furnished sufficient evidence that the land was in arrear for taxes previous to 1820. And further, the amount of tax was fully equal to that charged in the list made out under the law of 1827. These papers were before the auditor of state when he made out the list upon which this land was sold, and they are now before the court. The list of judgments, alone, without any other list from the auditor of the county, would *410 'furnish the auditor of state with sufficient information, from which to make out the list for the auditor of the county. *
There was no law of the state previous to the act of 1827, under which such lands as had been forfeited under the act of 1822, would be sold. They remained from the time of the forfeiture, the property of the state, and the state had perfect right to direct their sale, as was done by the act of 1827.
The objections which are raised by the defendant, are objections' which do not go to any substantial defect in the proceedings. They are rather to matters of form than of substance. Even if well taken, they would not justify this court in declaring a deed invalid, which the law under which 'it was made declares shall not be invalidated for “ any error in the listing, selling, or conveying” said land.
In the opinion of the court, the conveyance by the auditor of Madison county to Lyne Starling, vested in him all the interest of the former owner of the entry and-survey. That interest was conveyed by Starling to the complainant. It was not a legal, but an equitable interest. It was, however, a perfect equitable interest, and the defendant having subsequently acquired the legal title, he holds in trust for the owner of th® equitable interest.

A decree may he taken accordingly.

N. B. A motion for rehearing was made in this case, unde* the statute, which was granted and the case continued.